All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and its honorable court. Please be seated. Our first case today is 2014-1406, Shukh v. Seagate Technology. Mr. Geckus. Good morning. I am Chris Geckus and I represent Alexander Shukh who is recognized as one of the great authorities and engineers in the hard drive industry who was trained in the Soviet Union and Belarus and worked there for many years in the same area and the United States in 1997 and was employed as an engineer at Seagate Technologies in its Bloomington, Minnesota plant. Mr. Geckus, on page 13 of the brief, the appellant cites a fairly lengthy site from a 2007 performance evaluation which is at J6286. When I looked at that, I found that in between the ellipses was almost a full page of material which is not shown by the ellipses and it looks to me like a direct and intentional attempt to mislead this court. Can you explain that to me? Your Honor, that's absolutely incorrect. The problem that I have in this brief is the number of issues. What's that have to do with what you left out? Because of the word limitation and I thought this was an appropriate way to do that to show that there was an omission there. I guess I could have broken it out into a paragraph but it's certainly not intended to mislead the court. It leaves out a lot of really relevant stuff. I'm sorry? It leaves out a lot of really relevant stuff. Well, I'm trying to make the point here by this quotation, by these two citations, that his complaint about not getting that he was a troublemaker, for a number of reasons, one of which was he kept claiming credit for inventions, that it turned out after the supervisor had worked with him for eight or nine months that that was correct. But there's certainly no intention and I don't think, Your Honor, that you think it's misleading. I do think it's misleading. I think it's selective. I apologize. I certainly didn't intend to do that because with Your Honor's extensive staff and intelligence, intelligence staff and experience here, I would think I would have expected you to go to the original source and see what was there. I don't think, however, that there's anything about what it is that I quoted here that's incorrect or made incorrect by the omission. It's made misleading. I suggest not, Your Honor. No, I suggest strongly it is. What Alex needs to understand, it says in the very next sentence after the end of your quote, is that much of this is self-inflicted and that gives examples of that sort of thing. And you're saying that somebody's conceding something when indeed it doesn't look like they are. No, it says it's his own fault because he's speaking up. There's other evidence in the record where he's still basically shut up. This is a guy who essentially was trying to get credit for his inventions. And what they're saying there, that's strongly corroborative, I think, of our theory of the case, that this fellow was being unjustly abused, which is something that at the very end of the last opinion in the case. Could I get you to focus on the standing question for correction of inventorship? Now, I certainly read your brief with regard to film tech, and no doubt you understand that no panel of this court can overrule a prior panel. So I'd rather not spend much time discussing it because there's nothing we as a panel could do, even if we were inclined to agree with you on that. I'm not sure that's right because when I petitioned the court in Bank, they said that the panel can decide whether or not the case should be heard in Bank. And I was going to spend my time... No panel of the federal circuit can decide whether a case should be heard in Bank. It takes the majority of the judges of the in-bank court to decide whether a case should be heard. It would be somewhat of a surprise, given the unsettled nature of this law, because of what the three justices of the Supreme Court... It would be something of a surprise that the panel of the court, if you believe that you are constrained as you are, and of course we agree that you are, not to be able to reverse this, not to write an opinion that says either to give the justification that Justice Breyer said it has been missing from the court's law, or explanation of film tech, or I've seen opinions where panels say we think this should go to the full circuit. I know that there are cases in the last... Can I just say, just as a matter of using your precious time this morning, can you turn to the substance of the standing question on what kind of plus on top of the general reputational harm, either made worse or not made better, either kinds of harm, is there enough evidence of here to withstand summary judgment? That very, very concrete question. Well, unquestionably there is, and it's related, I think, to the question that Judge Wallach raises, much to my embarrassment and chagrin, and I apologize to the court for even the potential that there's a suggestion of improper citation. I humbly apologize. It was... But on the reputational harm, right? So there is something about Seagate showing its interest in how many patents your client had, which potentially might affect future employment, is that one? That's one of them, but the other one, the one most concrete is related to the question raised by the quotation that I put in there. This is a fellow who was excoriated repeatedly for claiming credit for his own inventions. He was saying, people are plagiarizing my stuff. He was disliked largely because of his national origin. It turns out he was right. He was right, and that's what this quotation that I have goes directly to, the question that this fellow was correct. His reputation, Seagate says, within Seagate, his reputation was of one who was I hope that sentence makes sense. His reputation inside Seagate was... Right, but just to make sure I understand, it may well be that his future employment prospects would be adversely affected by the manner in which he handled his grievance about not getting credit, but it may also, I think this is your theory and I want to understand it, it may also be the case that the way future employers might reflect about his manner of dealing with his colleagues would be affected favorably by a patent office recognition that he was right about some of his grievances, even if he expressed his belief that he was not getting credit in a less than polite or delicate way or whatever the right word is. Well, I think that's right if I understand your point, Your Honor. I think that's right, but the point that I was trying to draw is that the reputational injury was a reputational injury inside Seagate itself, that he was claiming credit for inventions that weren't his. But that's not exclusively your argument because you put on, okay, I just want to make sure, because you put on experts that said in this field, patent portfolios, the larger the better, they identify you as one of the more premier scientists. And if I understood the record right, he had 15 Soviet patents, but 20 U.S. patents, and what's at issue here is six U.S. patents and or applications, and that would be a 30% increase in his patent portfolio. And so your expert testimony was that people in this field recognize that as a sign of your innovativeness, creativity, whatever, right? That's right, and it goes directly to the holding of the district court. You have some, to make sure I understand, so you have generalized reputational impact in terms of people in this field value the number of patent applications, and this would be a 30% increase in his, which I don't think most people would recognize that as a significant amount. I mean, if you had 100 applications, and this is one little insignificant one, right, probably couldn't have a big impact, but these set of facts. But then you also have the more specific ones, which you're saying that the record here establishes, I think, as I understand you, that he was viewed internally as a complainer and that, in fact, his complaints, if this suit proves to be as you say it is, will prove that his complaints were all justified and true. That's right, that's exactly right. Mr. Giggis, what's the law on publication when a, just sticking to the corporation, when the defamatory statement is internalized? Well, the law, as I understand it, is that employees can be defamed inside a- What's the authority on that? I'm not sure that the issue is one that's particularly raised. Perhaps you can point me to- Well, you're the one who said that one of your concerns was the internal statement, and that's why I'm asking that question. I see your point, but it's not defamation in that sense. I guess defamation is sort of the flip side of the coin of a bad reputation. It's not that we're saying that he was- No, it's the same side of the coin. Well, perhaps, all right, then analytically then I'll accept that structure, but the point- So one element of defamation is, of course, publication. If I say to you, you're a bad, and nobody else hears it, it's not published, so it's not defamatory. It's missing an element. If we're all part of a family, and we say it internally, it's still within defamation law, not defamation, because part of that internal element. I haven't looked at that question within a corporate entity. Yeah, well, I don't think our briefing and our theory is not so much a defamation theory as it is a reputational. The reason we do that is the linchpin of it is the reputational suggestion that's never been played out by this court having to do with standing. The reputation, even though you don't have ownership, reputation might be enough to give you. We say, okay, reputation, in this case, his reputation inside Seagate, throughout Seagate, was very, very bad because people were telling him, shut up, this guy, you're a troublemaker, you're claiming credit for investments that really aren't yours, when in fact that was completely wrong. His reputation as an- But you're seeking standing to correct inventorship, and correcting inventorship could do nothing to change the nature of his reputation in Seagate. He's no longer employed there. No, no, no. This happened during the time that he was at Seagate. This was a fight that went on- The correction of the inventorship, all of that arose after he left Seagate. He wasn't even aware of the fact that he wasn't listed on the patents until after he left Seagate. So the relief that you're seeking is affirmative looking. I don't see how that could impact his reputation within Seagate, but didn't you introduce some evidence that at least at Hitachi, one of the two places he had interviews, I think it was Hitachi, that they suggested to him that his reputation vis-a-vis from Seagate was one of the reasons he would be unlikely to secure employment there. Yes, that's correct. So that would be the forward-looking component of the reputational harm or potential defamation, not in the form of seeking damages for defamation. We do not agree. We think it's a factual question as to whether or not if he corrects inventorship after he's gone from Seagate, whether his reputation inside Seagate is going to be enhanced. Because there is no question from the testimony in this case, we're not pointedly briefed on it, there's no question that this is a fellow who was disliked, perhaps even hated, by the power structure inside Seagate. And you can bet your bottom dollar that if his reputation inside Seagate would be significantly enhanced, but in any event, that's a factual question. What would the effect of the... You are well into your rebuttal time, so I think that we better keep this moving. I'll restore some of your rebuttal time. Let's hear from Mr. Drown. Drown? Yes, Your Honor. May it please the court. I'd like to start off with trying to address Judge Toronto's and Judge Morris' comments on evidence on inventorship. And what I'd like to start with is... On harm from lack of reference. Yes, Your Honor. The first issue I'd like to point the court to is this issue of what did Dr. Shook say about his inventorship or his standing and whether there was harm to his reputation? Can you assume with me for a minute that I don't view that testimony as dispositive of the question? He said, yeah, I've always had a great reputation. Okay. Might it have been better? Maybe. I don't think he says in that testimony it might not have been better. Can you focus on the things that we were talking about that Seagate indicated in certain documents that it cared about how many patent applications he had? That's some evidence that maybe future employers might. Maybe his reputation for not getting along with his fellow workers because he was claiming credit might be improved if it turned out he was right about many of his claims. Those are, I guess, the two things that I'm really focused on. Two things which I think I can pull out of that, Your Honor, is one where I think Your Honor is saying that Seagate was indicating that it mattered to them how many patents he was getting. That was in the context of Dr. Allen dealing with Mr. Shook, personally taking him under his wing and saying, Mr. Shook, you're telling me you're not going to give us ideas. You're affirmatively... No, it's actually in his performance evaluation. The last one he received from Seagate. Why don't you grab your appendix so we can be very precise at page 5222. It's August performance evaluation and I'll wait until you get there. 5222. The bottom of the page, it says, Alex has a long history of generating good ideas. He has a significant patent portfolio. However, I am concerned that the number of patent applications has been reduced over the last two years, albeit partially due to issues with the PRB and Seagate policy. I'd like to see Alex increase his patent portfolio in FY98. I think that the question is, obviously, despite the fact that at this point in time he already had 20 U.S. applications, his direct line supervisor's criticism in his performance review was suggesting a need for more patent applications. Given that, why isn't that indicative of the fact that if he had more patent applications where he was listed as an inventor on, it would inert to his benefit reputationally within Seagate, outside of Seagate with future employers? If Seagate valued it, what evidence is there other employers wouldn't also? Your Honor, I think the issue is here, this is what I was trying to explain is Mr. Allen is dealing with Dr. Shook and dealing with Dr. Shook in this context that Dr. Shook was not giving Seagate ideas about inventions. He told Mr. Allen, I'm not going to give you ideas about this and this is Mr. Allen saying, hey, wait a minute, you've got an obligation as an employee paid to invent and develop our technology to give us ideas. One of those ways of doing that is through... I don't see any evidence of that in the record. In fact, what the evidence shows is at this very time, he was submitting a large number of invention disclosure statements to the PBR in order to try to get them to pursue patent applications on them and this statement doesn't say invention disclosure statements or ideas. It says patent applications and patent portfolio and it talks about how he understands some of the problem might be the PBR deciding not to pursue all of Mr. Shook's ideas, but nothing in this statement says anything about ideas. It talks about the raw number of patent applications. This is at A-96-72 of the appendix. But I don't know what's at A-96-72 and it's sort of irrelevant. If Mr. Allen was also upset because Mr. Shook's not coming forward with enough ideas, that isn't really relevant, it seems to me, to the point that Mr. Allen was saying to him, a significant measure of your success as a scientist in this company is the number of patent applications that you're listed on. The point that Mr. Shook is making is that that affects his reputation and future employment prospects. I don't see on summary judgment how your company's own statement of the importance of the number of patent applications doesn't at least get him over the summary judgment hurdle. Well, if we can, that's not exactly what happened. Dr. Allen testified at his deposition that that wasn't a big issue at what he meant by his statements in the performance review, but this is summary judgment. If Dr. Allen makes a clear statement about the importance of patent applications but then later comes along, I didn't really mean that. This is summary judgment. If the district court would choose to hold that after a trial as a matter of fact finding based on Dr. Allen's credibility, that's okay. But is it okay to make credibility assessments like that on summary judgment? Well, the other thing here too, Judge Moore, is that this has nothing to do with these specific injuries. But that's irrelevant because what Mr. Allen says is that you need to increase your patent portfolio, increase the number of patent applications that you are listed on. That is what he says. So who the heck cares whether he's talking about these particular ones or different ones? He's saying the raw number of applications that you're listed on has gone down in the last two years and he'd like to see that go up. This would be a 30% increase. These six applications would increase 30% his patent numbers. Two things. That was because he told Mr. Allen, I'm not going to give you ideas. But second, it does absolutely matter to the standing inquiry because standing under Lujan is a concrete and particularized to this specific individual and these specific patents. So the question is, was his reputation harmed by being admitted from these six specific patents? And on that issue, there's not a shred of evidence in the record. And particularly, there's evidence to the exact contrary, Your Honor. And I'd like to point, Your Honor, to that. And that's testimony from not only Dr. Shook himself, but his co-workers. His patents are in his field, correct? Correct. And you have a statement by a supervisor. You have statements by experts that say that one measure of someone in this field's success is by the number of patent applications they have. Isn't that right? Isn't that what this record reflects? No, it does not. There isn't testimony. The number of patent applications that you have or the number of patents you're listed on is one of the measures by which people in this field are evaluated. There is not. The expert testimony you're talking about is from Howard Rockman, their expert. That we want to look at his testimony. I'd be very happy to. It's 88-16-17. That's his report. It's a half a page, literally a half a page, where he said... How long does it take to say that the number of... Any person in a scientific community of any kind knows that being listed on publications and listed on patents is a measure of your success. It is absurd. Are you going to contradict? Are you going to stand here and tell me that this record and it does not support the idea that being listed on publications or patents is valuable to people in this field? Not for these specific patents and for this specific individual, Your Honor. That's the issue that we're looking at. For that issue, we have Frank Stegeberg, Alan Johnston, co-workers at Seagate who said this. Question. This is 91-89 in the appendix. Do you know specifically how many patents Dr. Shook was listed on? Answer, I have no idea. What do you think more highly of him if he had 25 versus 15? No, I would not think more highly or less highly. Vlad Vlasko at 97-92. Question. Whether it's 25 or 30, would you still think very highly of him? Yes. You still think he's a genius? Correct. You still think he's a prolific inventor, one of the world's best inventors? Yes. Hard to imagine he'd have a better reputation with more patents? Yes. So, it doesn't matter on this specific record for these specific patents... These were both people that were already familiar with this individual. In fact, what you just read to me was you think he's a genius, right? You think he's super intelligent. So, of course, if I happen to think you're a genius, it probably isn't going to matter to me that you have 20 versus 26 patents. However, if I don't know you and you are applying for a job with me in a relevant technological field, are you saying that you don't think that there's evidence in this record that 20 versus 26 patents is going to matter? You're reading me testimony of people that already... C-gate employees who already have a preconceived notion of him, who've already worked closely with him and therefore know how smart they think he is or not is based on their own interactions with him. So, the fact that he had 20 versus 26 patents doesn't seem to me as likely to be able to impact, given all their other data points that they already have, what they think about him. But to an employer who has no familiarity with him and no experience with him, doesn't this record reflect that employers in this field value patent applications and the larger the number, the better? There's not any evidence from any employer in this record about whether they thought something differently, better or worse about Dr. Shook. Not from Hitachi. Nobody was deposed from Hitachi. We don't have a declaration from Hitachi. We don't have anything about that. We have counsel's argument and innuendo based on, at best, something where Dr. Shook blacklisted me. That's all we have. That's not evidence for summary judgment. Can I just change the focus just a little bit and I'm just not remembering. Is there some evidence in the record that potential future employers understood that his reputation at C-gate for not playing well with others was an impediment to hiring him? I don't know. I don't know of that evidence, Your Honor. It certainly hasn't been presented to the district court or this court in any highlighted way. So what we're left with, Judge Warren and Your Honor, is we don't have any evidence from an employer saying this mattered to me. I'm sorry. I may have asked the question precisely. I wasn't restricting myself to prospective employers understanding that within C-gate, whatever his talents and actual contributions were, that he had certain negative marks for not being a good team player. There's certainly evidence that Dr. Shook had evidence of from the very beginning, from his 1999 evaluation. Assuming there's some evidence which seems plausible that a future employer might well care about what kind of personal interactions an individual had and would therefore have if hired, to the extent that some of the negative characteristics of that were based on his claiming credit for things that other people thought he didn't deserve credit for, would it not, as a common sense matter, alter that in his favor if it turned out that the patent office suddenly recognized him as in fact having made a contribution that he was right in his complaint, even complaints to other people, even if he was not the most So two issues or points I can try to respond to that directly is I don't know what another employer would think. There's not evidence of that or how they would view that. The second issue is, which is very glaring on this record, is that in order for that premise to be true, there has to be evidence proving he was an inventor on these six specific patents at summary judgment. And there was none of that in this case, that he was actually an inventor on these patents. I'm sitting here and I'm trying to remember. I don't think, in fact, I'm going to say it more positively. I think you said affirmatively in your red brief, the following is not relevant to the standing question here, but here's a page or so about how he really wasn't an I think you just said at the podium that he actually had to make a showing on the merits of his joint inventorship claim in order to... No, what I'm trying to say is that that's relevant to two things. If there's harm to his reputation, that harm is because he was an inventor and that he was omitted. And that's what he's trying to prove. Right. And if you're going to try to show that, you have to show that at summary judgment. And the second thing for fraud, for fraud... We're not talking about fraud. We're talking about correction of inventorship and let's keep it limited to that. Yeah. I was just sure we can keep it to that. But what we were saying where we mentioned that, Your Honor, as I believe we said, the court didn't have to decide that issue, but we wanted to make clear that we didn't think he had a case on actual correction of inventorship. I don't remember seeing in the record here, and maybe there isn't, but the patent set issue here, have they been asserted by Seagate against anybody? Not that I'm aware of, Your Honor. And as for his claims of inventorship, he had two invention disclosure statements to the PBR, STL 11583 and 547 or 11473. And didn't he receive emails, in fact, August 18th at 1054 AM from the IP department of the company saying that his invention disclosure was going to be combined with another and a patent application would be filed on it? And in fact, doesn't the email say entitled Magnetic Head for Perpendicular Recording with Reduced Sidetrack Erasure, that's his disclosure statement? And isn't that, in fact, the name of the patent application that was then filed that I read and seems to reflect his disclosure pretty closely? I'm not sure exactly what disclosure you're referring to, but that Magnetic Head for Perpendicular Recording with Reduced Sidetrack Erasure, it's one of the ones he also received an award for inventorship from Seagate for, and he was told by email from the Seagate patent department that that disclosure would be combined with STL 11583, a copy of which is attached to this email to file patent applications on. And the resultant application really does seem to reflect the combination of those two, since I actually took the time and So I don't really, I'm finding, given the emails from Seagate's IP department that expressly tell him that his disclosure is going to be combined with another and an application will be filed, and then there is an application that was in fact filed with the identical name on his disclosure, doesn't that put forth enough to survive summary judgment that maybe he is, in fact, an inventor on that patent application? Without those exact ones in front of me, but I'm not sure, but what I can You're the one who just made the point that he didn't proffer any evidence to survive summary judgment on the actual inventorship issue. Right, because to determine inventorship, you have to go claim by claim, limitation by limitation, show that you conceived of one of the elements and that your contribution is not insubstantial in light of the prior art, and that you collaborated with the named inventors. And the inventors, the invention disclosure that he submitted, I think I'd be correct on this, but I, without double checking, but I don't think he that he collaborated with. It was his alone, and the other inventors had their own without him, so that would suggest there's no collaboration in our expert, explain that. No collaboration, actually, I don't think you understand conception law. Each inventor has to contribute to a single claim, but they don't have to work together, they don't have to have ever spoken to each other, they don't have to be in the same country or state, but if the application is combined to include both of their work, that's sufficient for conception and for inventorship, so I'm not fully understand your point about he listed himself and only himself. The IP department said his disclosure would be combined with the disclosure that lists all these other people in a single patent application. Are you saying the CKIP department did something incorrect? Maybe what you're saying is this patent is invalid, because what you're saying, it seems to me, is if his disclosure was combined with someone else, and if your view of the law of conception is such that they would have had to collaborate, then that makes this patent invalid, doesn't it? No, I don't think that's true, your honor. I think I would quibble with you about the law of conception and what's required for collaboration. I don't think you have to have some real form of collaboration. I don't think you have to have any. Well, I think the law is very clear that you do have to have some form of collaboration for conception, and then on the other issue about whether you actually contributed something that's insubstantial under the prior art, we have an expert that explained that he didn't do that, and so that's also another reason that inventorship or correction wouldn't work in that circumstance. But the point is, for this appeal, there's simply no evidence from Dr. Shook, from an employee, or from someone else that his reputation was harmed because he was not put on these specific patents. And on that issue, we think the record is clearly in our favor. Dr. Shook said it, former colleagues said it, and we think that there's simply no genuine issue on that particular issue, and it's just an abject failure of proof on that. And so, I know I'm out of time, but... Thank you, Mr. Drown. Thank you. We appreciate your time. We'll give Mr. Gikas, am I remembering it right? I'm sorry. Gikas, two minutes of rebuttal. Please restore two minutes of his rebuttal time. All right, thank you. I tried to glance through the opposition brief in this case to see whether or not my learned opponents called me out for the ellipses, and I don't think they did. I'll go back and check about it. So, I didn't mislead them. I apologize again if there's a problem with serious, very serious. It's nothing more serious to an appellate advocate to hear a judge say that, and it knocked you back on your heels, and I apologize for that. I'd like to go to the question about the Allen clarification. There's no question... You can assume it. If you say it, I look. Right. I've been doing this a long time, and I know that you do, and ellipses are treacherous, treacherous things. They really are. And because of the number of issues we raised, I know you saw my quotation from Judge Prettiman, and I know you know who he is about put all the good ones in. I did, and it really crunched down the amount of words that I needed to do, and it's the curse of the solo, I call it. I'd like to deal briefly with the 30 seconds I have the question, the clarification by Allen and his testimony, and how that really points up what the district court did in this case, which is conduct essentially a trial, a paper trial. We are entitled to the benefit of all of the inferences in this case, and standing alone, that memorandum by Mr. Allen criticizing, which I think is a fair word, Dr. Shook for a lesser number of patent applications and for substantial evidence internally of the damage that was done to him and the reputational damage. There is other evidence in this case, including by our two more patents would have made a big difference to this guy's application, even though it was eventually granted. And then of course, our patent... Who was that? Who said that? I'm sorry? Who said that? John Benson, the INS expert, a lawyer. I don't remember, since it was in fact granted, does that expert say it would have been granted earlier, and would the earlier grants have mattered to Dr. Shook? What he says is it makes it stronger. In general. It would have made it stronger. It made this application stronger. In hindsight, you can say, who cares? You mean his job application? No, his immigration. Yes, his H-1B application. What happened here is that Seagate filed a thousand pages of accolades of Dr. Shook in the early 2000s, not a word of critical of his inability to work, not a word of it critical. But would they with an H-1B? Well, you know, it's under oath. Well, it's true. It's under oath. So if they have reservations... You're always saying it's the best thing since sliced bread. That's right. But still, it's under oath. It seems to me that honesty would have required some allusion to it. But really, our point is they didn't say it because it wasn't true. What they're saying now wasn't true at the time. And the other expert is our patent expert, a very experienced practitioner, had been at the patent office himself, Howard Rackman. He said that more patents make a difference. And what the judge held here is that more is not better. And that's just simply wrong. And in any event, it's a factual conclusion. We're entitled to have a jury. Seagate's never denied that Dr. Shook is a genius, right? I mean, they've gone along with it. Well, it's an interesting subplot in this case that doesn't appear in the briefs. In fact, the original attack of Dr. Shook in this case, you read the first few pages of his deposition, is at least an implied attack on you are an egomaniac and you over-claim. You think you're so great and you're not so great. One of the questions in the deposition, do you really believe that you're the guy that invented all this stuff that, in fact, he had invented? That's almost a precise quotation of the question to him. So we had to go back and dredge out the H-1B application, go out to California, get the patent lawyers to authenticate it. And it's really a thousand pages of glowing stuff covering the same period of time that that question covered. This is a fellow who was treated very, very badly. Okay. I think that we have your argument. The time is way past expired. I think we should move on to the next case. Thank you. You don't even have to sit down if you don't want. The next case is Tuesday.